UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| JEFFREY CREED SIMMONS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.: 1:18-CV-91-KAC-SKL |
| ) | |
| OFFICER PATRICK RAMSEY, OFFICER ) | |
| JASON KIBBLE, and CORPORAL GENE ) | |
| PLANER, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER
## GRANTING SUMMARY JUDGMENT IN PART

This case is before the Court on the "Second Motion for Summary Judgment of Patrick Ramsey, Jason Kibble and Gene Planer," [Doc. 106], and the "Motion to Strike Portions of the Plaintiff's Second Response to Motion for Summary Judgment" filed by Defendants Officer Patrick Ramsey, Officer Jason Kibble, and Corporal Gene Planer (collectively, the "Moving Defendants"), [Doc. 111]. For the reasons stated below, the Court **GRANTS** the Moving Defendants' Motion for Summary Judgment, [Doc. 106], **IN PART**; **DENIES** the Moving Defendants' Motion to Strike as **MOOT**, [Doc. 111]; and **DISMISSES** this action.

### I.     Background[1]

In the early morning hours of May 11, 2017, Jeffrey J. Simmons ("Mr. Simmons") arrived at the Hamilton County Jail (the "Jail") after being arrested on "various drug charges and a previous warrant for domestic assault" [*See* Docs. 106-3 ¶ 3 (Declaration of Gene Planer ("Planer

---

[1] Because Plaintiff is the non-moving Party, the Court describes the relevant facts in the light most favorable to him. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

Decl.")); 106-1 ¶ 3 (Declaration of Jason Kibble ("Kibble Decl."))]. At the time of Mr. Simmons's arrival, Defendant Officer Kibble was working intake at the Jail [Doc. 106-1 ¶ 3 (Kibble Decl.)]. "Several minutes" into the intake process, "Mr. Simmons began to complain [to Defendant Officer Kibble] of chest pains" [*Id.* (Kibble Decl.)]. Defendant Officer Kibble and the other Moving Defendants do not have medical training beyond basic first aid [*See* Doc. 107 at 6]. Accordingly, Defendant Officer Kibble "contacted medical personnel to examine [Mr. Simmons]" [Doc. 106-1 ¶ 3 (Kibble Decl.)]. While "waiting for medical assistance, Mr. Simmons also began to complain of pain in both arms, so [Defendant Officer Kibble] contacted medical personnel once again to request a faster response" [*Id.* (Kibble Decl.)]. Hamilton County Jail Nurse Audrey Adams responded and checked Mr. Simmons's vital signs around 3:30 a.m. [*Id.* ¶ 4 (Kibble Decl.)]. Nurse Adams asked Mr. Simmons a series of questions, and Mr. Simmons stated "that he had recently used Methamphetamine earlier in the day" [Doc. 1-1 (Internal Affairs Investigation Report ("IA Report")) at 27]. Nurse Adams noted that Mr. Simmons was "a little sweaty," but that his vital signs were normal and "no distress [was] noted" [*Id.* at 32 (IA Report)]. Following her evaluation, Nurse Adams told Defendant Officer Kibble that Mr. Simmons "was fine and that his booking process could continue" [Doc. 106-1 ¶ 4 (Kibble Decl.)].

During the booking process, Defendant Corporal Planer "heard Officer Kibble raise his voice" and "went to check on [Defendant Officer Kibble]" [Doc. 106-3 ¶ 3 (Planer Decl.)]. Defendant "Officer Kibble explained [to Defendant Corporal Planer] that Mr. Simmons had [been] complaining of chest pains but had just been examined and cleared by Nurse Adams for entry into the Jail" [*Id.* (Planer Decl.)]. Defendant Corporal Planer "relied on this information" from medical personnel and "never observed any indication from [Nurse Adams] or any other Jail staff regarding

2

Mr. Simmons that would lead [Defendant Corporal Planer] to question whether [Mr. Simmons] was suitable to remain in custody" [*Id.* (Planer Decl.)].

Defendant Corporal Planer and Defendant Officer Ramsey then took Mr. Simmons "into the inmate restroom" to perform a compulsory strip search before Mr. Simmons entered confinement [Doc. 106-1 ¶ 5 (Kibble Decl.)]. "During the strip search, Mr. Simmons followed all verbal commands to remove each part of clothing without any sign of distress" [Doc. 106-3 ¶ 4 (Planer Decl.)]. Defendant Corporal Planer "saw nothing at that point in time which indicated [Mr. Simmons] needed, or was requesting further medical attention" [*Id.* (Planer Decl.)]. Following the search, Mr. Simmons "dressed himself in the appropriate uniform without assistance . . . and exited the bathroom after a couple of minutes" [*Id.* ¶ 5 (Planer Decl.)]. When Mr. Simmons exited the bathroom, Defendant Officer Kibble "did not observe any difficulty on [Mr. Simmons's] part" [Doc. 106-1 ¶ 5 (Kibble Decl.)]. Defendant Corporal Planer and Defendant Officer Ramsey then "escorted [Mr. Simmons] to cell 1HC8 to await booking on his charges" [*See* Docs. 106-3 ¶ 5 (Planer Decl.); 106-1 ¶ 5 (Kibble Decl.)].

Defendant Officer Ramsey "conducted 'well-being' checks on the inmates in cell 1HC8" at 3:48 a.m., 4:17 a.m., 4:42 a.m., and 5:09 a.m. [Doc. 106-5 ¶ 3 (Declaration of Patrick Ramsey ("Ramsey Decl.")]. "Well-being" checks are "performed periodically to determine if any inmate is displaying signs of distress while being held in cells at the Jail" [*Id.* (Ramsey Decl.)]. At some point in time, other inmates in cell 1HC8 banged on the door of the cell in an attempt to notify some officer that Mr. Simmons was experiencing medical issues [Doc. 1-1 at 40-42 (IA Report)]. And inmates in the cell told an "Officer Moore" about Mr. Simmons's medical issues [*Id.* at 40-41 (IA Report)]. Around 4:00 a.m., Mr. Simmons informed Defendant Officer Ramsey that "he was feeling bad" [*See* Doc. 106-5 ¶ 4 (Ramsey Decl.)]. Defendant Officer Ramsey "went to medical

3

staff to request that Mr. Simmons be checked, but . . . was informed that [Mr. Simmons] had just been cleared by medical to be placed in a cell" [*Id.* (Ramsey Decl.)]. Medical staff told Defendant Officer Ramsey "that [Mr. Simmons] had ingested a lot of Methamphetamine and that he was coming down off it" [*Id.* (Ramsey Decl.)]. "The nurse on duty told [Defendant Officer Ramsey] to finish [his] check [of the other cells] and then see how [Mr. Simmons] was doing" [*Id.* (Ramsey Decl.)]. When Defendant Officer Ramsey finished his rounds and returned to Mr. Simmons's cell, Mr. Simmons was sleeping [*Id.* (Ramsey Decl.)].

At approximately 5:30 a.m., Defendant Officer Ramsey was serving breakfast to inmates on the first floor of the Jail when inmates in cell 1HC8 told him that Mr. Simmons needed medical attention [*Id.* ¶¶ 5a-b; *see also* Doc. 1-1 at 43 (IA Report)]. Defendant Officer Ramsey went to cell 1HC8 and "observed that Mr. Simmons was unwilling to get up for his meal but was breathing fine" [Doc. 106-5 ¶ 5b (Ramsey Decl.)]. Defendant Officer Ramsey noted that Mr. Simmons "was suffering no apparent trauma," but "could tell that [Mr. Simmons] did not feel well" [*Id.* (Ramsey Decl.)]. Defendant Officer Ramsey "notified Deputies Moore and Williams, who were also serving breakfast, that Mr. Simmons was unwilling to get up for his tray," but Defendant Officer Ramsey "did not perceive that Mr. Simmons was experiencing a medical crisis" [*Id.* (Ramsey Decl.)]. Deputy Moore accompanied Defendant Officer Ramsey to check on Mr. Simmons again [*Id.* ¶ 6 (Ramsey Decl.)]. "Since Mr. Simmons had been medically cleared before he was placed in the cell, and based on [the] observations of [Mr. Simmons] made at that time, [Defendant Officer Ramsey and Deputy Moore] determined [Mr. Simmons] simply did not want to get up (which was not unusual in a jail setting)" [*Id.* (Ramsey Decl.)]. Deputies continued to serve breakfast to the individuals in the surrounding cells [*Id.* (Ramsey Decl.)].

4

When the other inmates in cell 1HC8 returned after breakfast, they noticed Mr. Simmons "was changing colors and was very unresponsive" [*See* Doc. 1-1 at 40 (IA Report)]. The inmates began to "yell[]" and "beat on the door" to alert officers [*See id.* at 42 (IA Report)]. Defendant Officer Ramsey heard the "inmates in cell 1HC8 banging on the door to report that Mr. Simmons needed emergency help" at approximately 5:35 a.m. [*See* Doc. 106-5 ¶ 7 (Ramsey Decl.)]. Defendant Officer Ramsey opened the cell door, and "it was immediately evident that Mr. Simmons needed emergency care as he did not appear as he had just moments earlier" [*Id.* (Ramsey Decl.)]. According to the statement of another inmate in the cell, Defendant Officer Ramsey entered and "said this man [Mr. Simmons] needs help now" [Doc. 1-1 at 42 (IA Report)]. Defendant Officer Ramsey "called for medical assistance over the radio and yelled to [his] fellow deputies on the floor for help" [*See* Doc. 106-5 ¶ 7 (Ramsey Decl.)].

"[O]fficers . . . immediately brought Mr. Simmons out of the cell and secured the cell door" [Doc. 106-3 ¶ 7 (Planer Decl.)]. "Because Mr. Simmons appeared blue in color, officers immediately began performing CPR. An officer was requested to obtain the AED defibrillator . . . from the booking office . . . because it was determined that Mr. Simmons had no pulse. A breath pump, or 'AMBU bag,' was also used" [*Id.* (Planer Decl.)]. Nurse Adams, who was in the booking office, was called to respond and "arrived very quickly thereafter" [*Id.* ¶ 8 (Planer Decl.)]. "Jail officers administered approximately three shocks from the AED" before Emergency Medical Services ("EMS") arrived [*Id.* (Planer Decl.)].

Defendant Officer Kibble heard the emergency radio call for medical assistance in cell 1HC8 [Doc. 106-1 ¶ 6 (Kibble Decl.)]. Defendant Officer Kibble then proceeded to cell 1HC8, where he was informed that he would be escorting Mr. Simmons to the hospital in the ambulance [*Id.* (Kibble Decl.)]. EMS personnel arrived at approximately 5:47 a.m. and assumed care of

5

Mr. Simmons [Doc. 106-5 ¶ 9 (Ramsey Decl.)]. EMS departed the Jail at approximately 5:53 a.m., [*Id.* (Ramsey Decl.)], and continued to perform lifesaving care on Mr. Simmons en route to and upon arrival at Erlanger Medical Center, [Doc. 106-1 ¶ 7 (Kibble Decl.)]. These efforts were ultimately unsuccessful. Mr. Simmons was pronounced dead at 6:21 a.m. [*Id.* ¶ 8 (Kibble Decl.)]. An autopsy concluded that his cause of death was a methamphetamine overdose with contributory coronary atherosclerosis [*See* Doc. 1-1 at 74 (IA Report)].

Plaintiff, Mr. Simmons's next of kin, filed the instant action on May 10, 2018 [*See* Doc. 1].[2] In his Second Amended Complaint,[3] Plaintiff asserts a claim against the Moving Defendants under 42 U.S.C. § 1983 for "Infliction of Cruel and Unusual Punishment by Deliberate Indifference to the Medical Needs of . . . [Mr. Simmons] in Violation of Mr. Simmons Rights under the Fo[u]rth and Fourteenth Amendments to the Constitution" (Count One) [*See* Doc. 51-1 at 8]. Plaintiff also raises state law claims against the Moving Defendants for Wrongful Death (Count Three), Reckless Infliction of Emotional Distress (Count Four), Intentional Infliction of Emotional Distress (Count Five), and Negligence (Count Six) [*See id.* at 13-15].

Throughout the pendency of this action, the Sixth Circuit law surrounding a Fourteenth Amendment right to medical care claim (also known as a "deliberate indifference" claim) has

---

[2] Plaintiff initially brought suit against Hamilton County, Tennessee; Officer Yeargan; Officer Ramsey; Officer Moore; Officer Kibble; Lieutenant Knight; Sergeant Jackson; Deputy Williams; Officer Wofford; Corporal Planer; Nurse Audrey Adams; and "other personnel as yet unidentified" [*See* Doc. 1]. Only Defendants Officer Ramsey, Officer Kibble, and Corporal Planer remain as Defendants in this action [*See* Docs. 60 (dismissing Officer Yeargan, Sergeant Jackson, Officer Wofford, Lieutenant Knight, and Hamilton County); 114 (dismissing Officer Moore, Deputy Williams, and Nurse Audrey Adams); 119 (dismissing "Other Personnel as Yet Unidentified")].
[3] Plaintiff's "Second Amended Complaint" [Doc. 55-1] is the operative complaint in this case [*See* Docs. 58, 60 at 2 n.2]. However, it appears that Plaintiff served summonses on Defendants with a copy of his "Amended Complaint," not the Second Amended Complaint [*See* Doc. 61]. And it appears that Defendants Officer Kibble, Officer Planer, and Officer Ramsey filed an Answer [Doc. 99] to Plaintiff's "Amended Complaint" [Doc. 61].

developed.  The Moving Defendants initially filed a Motion for Summary Judgment [Doc. 91] under the standard set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994).  To be liable under *Farmer*, "a prison official . . . must know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  After the Moving Defendants' initial motion for summary judgment was fully briefed under *Farmer*, the Sixth Circuit decided *Brawner v. Scott County*, 14 F.4th 585 (6th Cir. 2021).  *Brawner* provided that to be liable "[a] defendant must have not only acted deliberately (not accidentally), but also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"  *Brawner*, 14 F.4th at 596 (citing *Farmer*, 511 U.S. at 836).  The Sixth Circuit also made clear that the Fourteenth Amendment—not the Fourth or Eighth—provided pretrial detainees the right to medical care.  *See Colson v. City of Alcoa*, 37 F.4th 1182, 1189 (6th Cir. 2022).

In March 2022, the Sixth Circuit decided *Trozzi v. Lake County*, 29 F.4th 745 (6th Cir. 2022).  Under *Trozzi*, a Fourteenth Amendment pretrial detainee deliberate indifference claim required a showing that:

> (1) the plaintiff had an objectively serious medical need; (2) a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk.

*Trozzi*, 29 F.4th at 757-58.  Noting these substantive changes in the applicable law, the Court denied the Moving Defendants' initial motion for summary judgment as moot, with leave to refile under the then-prevailing legal standard [*See* Doc. 105].

7

The Moving Defendants filed the instant Motion for Summary Judgment, [Doc. 106], under the *Trozzi* standard. However, while the instant Motion was pending before the Court, the Sixth Circuit decided *Helphenstine v. Lewis County*, 60 F.4th 305 (6th Cir. 2023). *Helphenstine* held that *Trozzi* is "irreconcilable with *Brawner*" and "[b]ecause *Brawner* was decided before *Trozzi*, *Brawner* controls." *Helphenstine*, 60 F.4th at 317. The Sixth Circuit recently denied petitions for rehearing en banc in *Helphenstine*. *See Helphenstine v. Lewis Cnty.*, No. 22-5407 (6th Cir. Apr. 18, 2023) (order denying en banc rehearing).

In the instant Motion for Summary Judgment, the Moving Defendants assert that they did not violate Mr. Simmons's Fourteenth Amendment rights and, in any event, are entitled to qualified immunity [*See* Doc. 107]. The Moving Defendants also assert that each of the state law claims against them should be dismissed because no genuine dispute of material facts exists [*See id.* at 17-25]. In response, Plaintiff asserts that "this is a case for jury determination" [Doc. 110 at 1]. In support of his position, Plaintiff relies upon select passages of statements given by inmate witnesses contained in the Internal Affairs Investigation Report ("IA Report"), [Doc. 1-1 (IA Report)], created by the Hamilton County Sheriff's Department following Mr. Simmons's death, [*see* Doc. 110 at 9-12].

The Moving Defendants separately moved to strike portions of Plaintiff's Response that rely on the inmate statements in the IA Report [*See* Doc. 111]. The Moving Defendants argue that the inmate statements Plaintiff relies on are inadmissible hearsay [*See id.* at 3-4]. In response, Plaintiff argues that the IA report is a business record and that the "inmate statements are present sense impressions," without further justification [*See* Doc. 112 at 3-4].

## II. Admissibility of Inmate Statements Plaintiff Relies on from IA Report

"[E]vidence submitted in opposition to a motion for summary judgment must be admissible." *M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 446 (6th Cir. 2021) (quoting *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997)). "And hearsay—an out-of-court statement offered for its truth—is inadmissible unless the Federal Rules of Evidence or a federal statute provides otherwise." *Id.* at 446-47 (citations omitted). "[A]t summary judgment, hearsay 'must be disregarded.'" *Id.* at 447 (quoting *U.S. Structures, Inc.*, 130 F.3d at 1189).

The Court has doubts as to whether any particular inmate statement identified by Plaintiff in his Response to Defendants' Motion for Summary Judgment is admissible [*See* Doc. 110 at 8-10 (citing Doc. 1-1 at 16, 33, 40-41, 45-47 (IA Report))]. *See Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir. 1994) ("[A statement of a third party] is plainly not admissible merely because contained in a police report. It is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted *but that statements made by third persons under no business duty to report may not*." (emphasis in original) (quotations and citations omitted)). Plaintiff has not sufficiently briefed the admissibility of each inmate statement and the multiple levels of hearsay at issue, as is his burden. *See Doe v. Farmer*, No. 3:06-0202, 2009 WL 3768906, *5 (M.D. Tenn. Nov. 9, 2009) (Plaintiff "fails to address, however, that there are two levels of hearsay in the report[ ]: first, the report [itself], and second, the statements by the witnesses."). But even if the Court considers each of the precise inmate statements Plaintiff identified, in context and as each relates to the culpability of the Moving Defendants, the outcome of the Moving Defendants' Motion for Summary Judgment would be the same. Accordingly, the Court considers the relevant inmate statements specifically cited by Plaintiff in context in the light most favorable

9

to Plaintiff as part of its analysis and denies the Moving Defendants' "Motion to Strike" [Doc. 111] as moot.

## III. Applicable Law

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the non-moving party and make all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Nat'l Satellite Sports, Inc.*, 253 F.3d at 907. However, in deciding whether summary judgment is appropriate, the Court refrains from "weigh[ing] the evidence and determin[ing] the truth of the matter," and instead simply asks, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 251-52 (1986).

The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has met this burden, the opposing party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586; Fed. R. Civ. P. 56). "A genuine issue for trial exists only when there is sufficient 'evidence on which the jury could reasonably find for the plaintiff.'" *Nat'l Satellite Sports, Inc.*, 253 F.3d at 907 (quoting *Anderson*, 477 U.S. at 249). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis in original) (quoting *Anderson*, 477 U.S. at 247-48).

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). The Court thus "begins by identifying the specific constitutional right," or rights, Plaintiff alleges were violated. *Id.* at 394 (citations omitted). Here, Plaintiff alleges that the Moving Defendants violated Mr. Simmons's Fourth and Fourteenth Amendment right to substantive "due process" by failing to provide adequate medical care (Count One) [Doc. 51-1 at 8-12]. But the Fourth Amendment provides no right to medical care. *See Colson*, 27 F.4th at 1189. So the Court analyzes Plaintiff's claim under the Fourteenth Amendment alone. The relevant Parties have done the same.[4]

Although "the Constitution 'generally confer[s] no affirmative right to government aid, even where such aid may be necessary to secure life, liberty or property interests[,]' . . . 'in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals.'" *Trozzi*, 29 F.4th at 751 (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196-98 (1989)) (citations omitted). "[T]he Fourteenth Amendment imposes on the government an affirmative duty to provide medical care to all those it takes into its custody" and covers "the period after arrest but before a judicial finding of probable cause." *See Colson*, 37 F.4th at 1187.

A claim for inadequate medical care includes both an objective and a subjective prong. As to the objective prong, a plaintiff must show that the detainee "had a sufficiently serious medical need." *See Helphenstine*, 60 F.4th at 317. And as *Helphenstine* recently clarified, the subjective prong requires "that each defendant 'acted deliberately (not accidentally) [and] also recklessly in

---

[4] To the extent that Plaintiff desired to maintain a Fourth Amendment medical care claim, he has not as a matter of fact—he has abandoned that argument—and cannot as a matter of law. *See id.* Accordingly, the Court dismisses any such claim.

11

the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *See Helphenstine*, 60 F.4th at 317 (quoting *Brawner*, 14 F.4th at 596-97).

"[A] non-medically trained officer" may "'reasonably defer[] to [a] medical professionals' opinion[]'" regarding a pretrial detainees' medical needs. *See McGaw v. Sevier Cnty.*, 715 F. App'x 495, 498 (6th Cir. 2017) (quoting *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006)); *see also Winkler v. Madison Cnty.*, 893 F.3d 877, 895 (6th Cir. 2018); *J.H. v. Williamson Cnty.,* 951 F.3d 709, 723 (6th Cir. 2020) (concluding that it is reasonable for jailers to take actions in "rel[iance] on medical judgments made by medical professionals responsible for prisoner care" (citation omitted)). This is so because a jail nurse or other medical professional "presumably ha[s] a greater facility than the average layperson to recognize an individual's medical need." *McGaw*, 715 F. App'x at 498 (quoting *Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009)). Further, the fact that a pretrial detainee is going through withdrawal, standing alone, does not require an officer to seek outside medical care for the detainee, because "withdrawal 'typically may be managed in a prison setting and indeed frequently is managed there.'" *Helphenstine*, 60 F.4th at 321 (quoting *Speers v. Cnty. of Berrein*, 196 F. App'x 390, 395 (6th Cir. 2006)).

Where applicable, the doctrine of qualified immunity shields a law enforcement officer, sued in his or her individual capacity, from suit under Section 1983. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Under the familiar test for qualified immunity, a public official is immune from suit unless the plaintiff establishes: (1) a constitutional violation; and (2) that the right at issue was 'clearly established' when the event occurred." *Gordon*, 20 F.4th at 1082 (citation omitted); *see also Pearson*, 555 U.S. at 231. "If either [prong] is not satisfied, qualified immunity will shield the officer from civil damages." *Gordon*, 20 F.4th at 1082 (citing *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)). For the right at issue to be "'clearly established,'"

"existing precedent'" at the time of the alleged constitutional violation "'must have placed the statutory or constitutional question beyond debate.'" *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). Plaintiff must either "identify a case that put [the officer] on notice that his specific conduct was unlawful" or show that this is an "obvious case" where the prevailing standards "'clearly establish' the answer, even without a body of relevant caselaw." *Id.*

## IV. Analysis

No Moving Defendant violated Mr. Simmons's Fourteenth Amendment rights. But even if Mr. Simmons's Fourteenth Amendment rights were violated, each of the Moving Defendants is entitled to qualified immunity.

### A. No Moving Defendant violated Mr. Simmons's Fourteenth Amendment rights.

Here, Mr. Simmons likely had an objectively serious medical need. *See Burwell v. City of Lansing*, 7 F.4th 456, 463 (6th Cir. 2021) ("[W]e have routinely held that a condition resulting in death is 'sufficiently serious' to meet the objective component."). But there is no evidence that any Moving Defendant "acted deliberately" and "also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *See Helphenstine*, 60 F.4th at 317 (quoting *Brawner*, 14 F.4th at 596-97).

#### i. Defendant Officer Kibble

Defendant Officer Kibble requested a medical evaluation immediately upon Mr. Simmons's first complaint [Doc. 106-1 ¶ 3 (Kibble Decl.)]. After asking Mr. Simmons a series of questions and taking his vital signs, Nurse Adams advised Defendant Officer Kibble that Mr. Simmons "was fine and that his booking process could continue" [*Id.* ¶ 4 (Kibble Decl.)]. Defendant Officer Kibble did not have medical training, nor did he observe anything that made it

13

unreasonable for him to rely on Nurse Adams's medical assessment that Mr. Simmons could safely remain in a cell—even if Mr. Simmons was experiencing withdrawal. *See McGaw*, 715 F. App'x at 497.

There is no evidence that Defendant Officer Kibble knew or should have known that following Nurse Adams's instructions would pose an unjustifiably high risk of harm to Mr. Simmons. *See Helphenstine*, 60 F.4th at 317. When Defendant Officer Kibble interacted with Mr. Simmons following Nurse Adams's assessment, Mr. Simmons was able to dress himself, walk without assistance, and follow instructions [*See* Doc. 106-1 ¶ 5 (Kibble Decl.)]. And Defendant Officer Kibble spent the remainder of his shift physically separated from cell 1HC8 until Defendant Officer Kibble responded to the emergency radio call regarding Mr. Simmons [*See id.* ¶ 6 (Kibble Decl.)]. Accordingly, Defendant Officer Kibble did not violate Mr. Simmons's Fourteenth Amendment rights.

### ii. Defendant Corporal Planer

Defendant Corporal Planer received much the same information regarding Mr. Simmons as did Defendant Officer Kibble. He had little direct interaction with Mr. Simmons and, in fact, most of Defendant Corporal Planer's information regarding Mr. Simmons's circumstances came secondhand from Defendant Officer Kibble relaying Nurse Adams's assessment [*See* Doc. 106-3 ¶ 3 (Planer Decl.)]. Further, what Defendant Corporal Planer himself witnessed of Mr. Simmons's condition did not make it unreasonable for Defendant Corporal Planer to rely on Nurse Adams's medical assessment. *See McGaw*, 715 F. App'x at 497. Defendant Corporal Planer did not observe any "manifestation of illness" that would give him a "'reason to appreciate the seriousness of [Mr. Simmons's] condition.'" *See Helphenstine*, 60 F.4th at 321 (quoting *Speers*, 196 F. App'x at 396). In fact, Corporal Planer observed Mr. Simmons follow commands, dress himself, and exit

14

the bathroom without difficulty [*See* Doc. 106-3 ¶¶ 4-5 (Planer Decl.)]. There is no evidence that Defendant Corporal Planer "acted deliberately" and "also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *See Helphenstine*, 60 F.4th at 317 (quoting *Brawner*, 14 F.4th at 596-97). Therefore, Defendant Corporal Planer did not violate Mr. Simmons's Fourteenth Amendment rights.

### iii. Officer Ramsey

Finally, Defendant Officer Ramsey did not violate Mr. Simmons's Fourteenth Amendment rights. Defendant Officer Ramsey called for a medical assessment as soon as Mr. Simmons told him that he did not feel well [*See* Doc. 106-5 ¶ 4 (Ramsey Decl.)]. Thereafter, he reasonably relied on that medical assessment and the direction of medical staff, personally observing symptoms like sleeping and refusing to exit a cell for breakfast that are consistent with both withdrawal and behavior in a jail setting [*See* Doc. 106-5 ¶¶ 5-6 (Ramsey Decl.)]. *See also Helphenstine*, 60 F.4th at 321 (noting that withdrawal is frequently managed in a jail setting). And Defendant Officer Ramsey reasonably relied on the judgment of Jail medical staff that Mr. Simmons was experiencing typical withdrawal symptoms and could safely do so while Defendant Officer Ramsey performed other assigned duties [*See* Doc. 106-5 ¶ 4 (Ramsey Decl.)].

Until Mr. Simmons's condition deteriorated, the serious risk of harm was not known to Defendant Officer Ramsey or so obvious that it should have been known. *See Helphenstine*, 60 F.4th at 317. And as soon as Defendant Officer Ramsey observed Mr. Simmons's condition deteriorating, Defendant Officer Ramsey took "reasonable measures in response to what he did see." *See Speers*, 196 F. App'x at 396. Defendant Officer Ramsey removed Mr. Simmons from the cell while calling for immediate medical assistance. Accordingly, Defendant Officer Ramsey did not violate Mr. Simmons's Fourteenth Amendment rights.

### B. Even if Mr. Simmons's Fourteenth Amendment rights were violated, the Moving Defendants are entitled to qualified immunity.

Further, even if Plaintiff established a Fourteenth Amendment violation, the Moving Defendants are nonetheless entitled to qualified immunity because the right at issue was not clearly established. *See Rivas-Villegas*, 142 S. Ct. at 8 (per curiam) (citations omitted). No existing precedent in May 2017 clearly established that any Moving Defendant's specific conduct was unlawful. In fact, existing precedent pointed in the opposite direction—recognizing that an officer who lacked medical training could reasonably rely on an appropriate medical assessment from trained personnel in a jail setting. *See Spears*, 589 F.3d at 255 (concluding that "plaintiffs have not established that [detainee's] condition and need for medical attention, which was not obvious to trained medical personnel, would have been obvious to a lay person" or officer). Accordingly, the Court must dismiss Plaintiff's Section 1983 claim against the Moving Defendants.

### C. The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state claims against the Moving Defendants.

Because the Court dismisses Plaintiff's Section 1983 claim—on which this Court's jurisdiction rests—the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims (Counts Three, Four, Five, and Six). *See Weser v. Goodson*, 965 F.3d 507, 519 (6th Cir. 2020); *see also* 28 U.S.C. § 1367(c)(3) (providing that a district court may decline to exercise supplemental jurisdiction when it has dismissed all other claims over which it had original jurisdiction).

### V. Conclusion

For the reasons set forth above, the Court **GRANTS** the "Second Motion for Summary Judgment of Patrick Ramsey, Jason Kibble, and Gene Planer" [Doc. 106] **IN PART** and **DISMISSES** Plaintiff's Section 1983 claim (Count One) against Defendants Ramsey, Kibble, and

16

Planer with prejudice. And the Court **DENIES** the Moving Defendants' "Motion to Strike Portions of the Plaintiff's Second Response to Motion for Summary Judgment" [Doc. 111] as **MOOT**. Further, the Court **DECLINES** to exercise supplemental jurisdiction over Plaintiff's remaining state law claims against Defendants Ramsey, Kibble, and Planer and **DISMISSES** those claims (Counts Three, Four, Five, and Six) without prejudice. Because no claims remain before this Court in this action, an appropriate judgment shall issue.

    IT IS SO ORDERED.

_____
KATHERINE A. CRYTZER
United States District Judge